## Lovell v. Commonwealth.

(Decided Oct. 2, 1934.)

E. BERTRAM for appellant.

BAILEY P. WOOTTON, Attorney General, and DAVID C. WALLS, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE CLAY—Reversing.

Robert Lovell appeals from a judgment convicting him of manslaughter and fixing his punishment at 21 years' imprisonment.

The record discloses that George Copenhaver and John Barnett owned and lived on adjoining farms. George Copenhaver's farm consists of two separate tracts, one of bottom land, and the other of mountain land. In going from his home on the bottom land to the mountain land he had to go over a passway that ran over the lands of John Barnett. The day before the homicide George Copenhaver had arranged with Tom Lovell to assist him in cutting wood from the mountain land. Tom Lovell, who is appellant's father-in-law, arranged for appellant to accompany the Copenhavers. Early on the morning of November 3, 1932, appellant went to the home of George Copenhaver. After hitching a team to a wagon, they placed a shotgun and some tools in the wagon, and started over the mountain. Tom Copenhaver, son of George, owned a pistol, and either he or appellant had the pistol in his possession. To reach the mountain where the timber was to be cut it was necessary to use the passway over the land of John Barnett. There had been litigation between John Barnett and George Copenhaver over the right of way, and there was considerable feeling between the families. However, there had been no feeling of any kind between appellant and the Barnetts. On the contrary, John Barnett married appellant's mother's sister, and the deceased, Luke Barnett, was appellant's first cousin, and their relations were cordial and friendly. As the Copenhavers and appellant approached the home of John Barnett, appellant and Tom Copenhaver were standing up in the front of the wagon, George Copenhaver was in the rear, and appellant was driving. As they reached the Barnett home where the passway leaves the public road, Tom Copenhaver got out of the wagon and opened a gate that was across the passway, and appellant drove the team through the gate. Tom Copenhaver then closed the gate and got back into the wagon. The passway runs between the house occupied by John Barnett and the house occupied by his son, Luke Barnett. At this point John Barnett came to the

passway from the right, and told the Copenhavers not to come over his land until the matter was settled. About the same time Luke Barnett appeared in front of the team and raised his hand, frightening the team. Thereupon Tom Copenhaver began shooting at Luke Barnett with a pistol, and, after firing three shots at Luke, turned and fired two shots at John Barnett. Immediately thereafter either Tom Copenhaver or George Copenhaver fired the shotgun at John Barnett. Tom Copenhaver then directed appellant to drive on, which he did. John Barnett died at once, but Luke lived several hours. Neither Luke nor John, according to the witnesses for the commonwealth, was armed at the time. Appellant was indicted for the murder of Luke. According to the dying declaration of Luke, and the evidence of his mother, Mrs. John Barnett, and her son, Fred, appellant, immediately before the shooting began, took from his pocket or belt a pistol, and handed it to Tom Copenhaver, and this is the pistol with which both Luke Barnett and John Barnett were shot. They further testified that George Copenhaver fired the shotgun.

On the other hand, appellant testified that he did not hand a pistol to Tom Copenhaver; and that George Copenhaver did not fire the shotgun. It was further agreed on the trial that both Tom Copenhaver and George Copenhaver testified on their joint trial with appellant for the killing of John Barnett that George Copenhaver did not fire the shotgun, and that appellant did not hand a pistol to Tom Copenhaver, and that these statements of the Copenhavers should be read as evidence in behalf of appellant without calling the official stenographer who reported the evidence on a former trial. There was also evidence to the effect that the pistol actually used belonged to Tom Copenhaver. Appellant further testified that, when his uncle John Barnett came down, Copenhaver said, "John, let's have no trouble, let's settle by law," and his Uncle John said, "Law, hell, I will shoot until hell freezes over," and that John Barnett had a pistol. He also testified that when Luke Barnett appeared Tom Copenhaver told witness to drive on, and Luke said, "No, God damn you, you won't," and put his hand in his overalls.

One of the grounds urged for reversal is the improper admission of evidence. The record discloses that on the cross-examination of appellant the following occurred:

"Q. Didn't you see George Copenhaver pick up the gun and raise up on the wagon bed and fire it into John Barnett's back? A. He did not.

"Q. Who did do that? A. Tom Copenhaver.

"Q. You saw that? A. Yes, sir.

"Q. On the trial of the Copenhavers, did you swear that? A. Yes, sir.

"Q. Have you ever seen a statement by George Copenhaver just before he died in the penitentiary for shooting John Barnett, and saying he swore false at the trial and say he did shoot John Barnett with a shot gun? (Objected to by attorney for defendant. Objection overruled, to which defendant excepted.)

"Q. Did you see that statement? A. Yes, sir. (Objected to by attorney for defendant. Objection overruled, to which defendant excepted.)

"Q. How long was that statement made before George Copenhaver died? A. I don't know.

"Q. He is dead now, isn't he? A. Yes, sir.

"Q. Where did he die? A. At Frankfort.

"Q. Have you got that death statement in your possession? A. No, sir.

"Q. Do you know who has? A. No, sir.

"Q. Who had it when you saw it? A. I think Tom Copenhaver handed it to me.

"Q. Tell this jury what you have done with that? A. I don't know what was done with it.

"Q. Why did you throw that down? (Objected to by attorney for defendant. Objection sustained.)

"Q. You don't know where it is now? A. No, sir.

"Q. Your statement now is that George Copenhaver didn't fire this shot? A. No, sir."

If George Copenhaver had been on the stand and had testified that Tom Copenhaver and not he fired the shotgun, doubtless it would have been proper to impeach him by showing that he had made the written statement that he had sworn falsely to the same effect on his trial for the killing of John Barnett, but that is

not the case. Over his objection and exception appellant was compelled to admit that he had seen and had in his possession the statement, which was referred to as a "dying statement." The statement was in no sense a "dying statement" or declaration within the meaning of that term. It was not made by either of the men who were killed. It was the voluntary statement of a witness and party to the homicide made long after the homicide occurred. In the circumstances, it is pure hearsay in so far as appellant is concerned, and does not come within any of the exceptions to the rule that hearsay evidence is not admissible. That being true, it should not have been admitted, and it remains to determine whether its admission was prejudicial error. It must not be overlooked that the only circumstance tending to show that appellant aided and abetted the Copenhavers is the claim that just before the homicide he handed Tom Copenhaver a pistol. On this question we have the dying statement of Luke Barnett, corroborated by the evidence of his brother Fred and his mother, Mrs. John Barnett, who differ as to the positions of appellant and Tom Copenhaver in the wagon. On the other hand, we have the evidence of the Copenhavers and appellant that he did not hand the pistol to Tom. The question, therefore, is a close one, and turns on the credibility of the witnesses. The effect, as well as the purpose, of bringing to the attention of the jury the fact that George Copenhaver had admitted that he swore falsely in saying that Tom Copenhaver and not he fired the shotgun, was to create the impression on their minds that appellant himself was swearing falsely when he stated that Tom fired the shotgun, and that for this reason no credence could be placed in his statement that he did not hand the pistol to Tom Copenhaver. In view of the sharp conflict in the evidence as to whether appellant did hand the pistol to Tom Copenhaver, it is by no means improbable that the evidence complained of had the effect of turning the scales against appellant. We are therefore constrained to the view that its admission was prejudicial error.

Another contention is that the instruction confined the right of appellant and of the Copenhavers to act in their self-defense, or the defense of each other, solely against actual danger at the hands of Luke Barnett, and did not give them the same right as to John Barnett, or the right to act on the appearance of danger. In view

of the threatening attitude and remarks made by both John Barnett and Luke Barnett, and the further evidence that a pistol was seen in the hands of John Barnett, we think that John Barnett, as well as Luke Barnett, should have been included in the instructions, and that the instructions should have embraced the right of the accused and the Copenhavers to act, whether in actual, or to them apparent, danger at the hands of either Luke Barnett or John Barnett. Watkins v. Commonwealth, 123 Ky. 817, 97 S. W. 740, 29 Ky. Law Rep. 1273.

Judgment reversed, and cause remanded for a new trial consistent with this opinion.